**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| PAMELA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-03020-STA-tmp |
| | ) | |
| SHARP MANUFACTURING COMPANY | ) | |
| OF AMERICA, a Division of | ) | |
| SHARP ELECTRONICS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Pamela Jones filed this action on December 29, 2014, alleging that her former employer Sharp Manufacturing Company of America, a division of Sharp Electronics Corporation ("Sharp") violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* as amended ("ADA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").[1] (ECF No.1.) Defendant Sharp has filed a motion for summary judgment (ECF No. 33), and Plaintiff has filed a response (ECF No. 34) and an amended response. (ECF No. 36.)

---

[1] The Court previously pointed out that "Plaintiff also notes in her assertion of the grounds for the Court's jurisdiction that the claim is brought, in part, pursuant to Title VII of the Civil Rights Act of 1964. Plaintiff does not, however, reference Title VII again – notably failing to do so within the later discussion of her causes of action." (Schd. Ord. n. 1 (citations omitted), ECF No. 17.) Plaintiff's reference to Title VII appears to be linked to her request for attorney's fees if she prevails rather than stating an independent claim and will be treated as such. *See Shepherd v. Honda of America Mfg., Inc.*, 160 F. Supp.2d 860, 875 (S.D. Ohio. 20001) ("As Plaintiff points out, 42 U.S.C. § 12217 provides ADA plaintiffs with "[t]he powers, remedies, and procedures set forth in" certain sections of the Civil Rights Act, including 42 U.S.C. § 2000e–5. In turn, § 2000e–5 provides that '[i]n any action or proceeding under this title, the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees ) as part of the costs.' 42 U.S.C. § 2000e–5(k).")

Defendant has filed a reply to the response. (ECF No. 39.) On April 14, 2016, the Court granted Plaintiff's motion to file a sur-reply to address evidentiary objections that were raised in Defendant's reply (ECF No. 44), and, on April 27, 2016, the Court granted Plaintiff's motion to file a sur-reply to address new arguments raised in the reply. (ECF No. 48.) The "evidentiary objection" sur-reply was filed on April 15, 2016. (ECF No. 45.) The "new arguments" sur-reply was filed on April 29, 2016. (ECF No. 51.) The parties have now fully briefed the Court. For the reasons set forth below, Defendant Sharp's motion is **DENIED**.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the nonmovant.[3] The Court must view the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[4] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[5] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a

---

[2] Fed. R. Civ. P. 56(c).

[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[4] *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

preponderance of the evidence that the nonmoving party is entitled to a verdict.[6]  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"[7] and must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."[8]

Defendant's Objections to Plaintiff's Proffered Evidence

As an initial matter, the Court will address Defendant's objections to the affidavits of Julia Elliott and Pamela Webster that have been submitted in support of Plaintiff's response.[9]  As noted by Defendant, Plaintiff did not identify Elliott or Webster as potential witnesses in her Rule 26 initial disclosures or in her answers to Defendant's first set of interrogatories.[10]  Plaintiff first mentioned these witnesses in her response to Defendant's motion for summary judgment that was filed on March 18, 2016.  Plaintiff amended her initial disclosures to include these witnesses on March 19, 2016.[11]  The amended disclosures also included previously unidentified witness, Laquitta Beckum, and were not provided until three months after the discovery deadline of December 18, 2015.

---

[6]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[7]  *Id.* at 251–52.

[8]  *Celotex*, 477 U.S. at 322.

[9]  (Amd. Resp. Affidavits, ECF Nos. 36-2, 36-3.)  The parties have used various spellings of Elliott's name.  Elliott signed her affidavit as "Julia Elliott." (ECF No. 36-2.)  Therefore, the Court has used this spelling.

[10]  (Reply, ECF Nos. 39-1, 39-2.)

[11]  (*Id.*, ECF No. 39-3.)

Rule 26(a) (1)(A)(i) requires that parties "provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subject of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment...." Rule 26(a) disclosures must be supplemented or corrected "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect...."[12] If a party fails to provide information or identify a witness under Rule 26(a) or 26(e), that party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or was harmless."[13]

Plaintiff argues that her failure to timely disclose Elliott and Watson was substantially justified because she did not become aware of the need for their testimony until after the close of discovery.[14] Plaintiff had intended to reply on Troy Lensey as a witness to the alleged harassment she received while working for Defendant, matters surrounding her EEOC charge, and Defendant's alleged replacement of her with a casual employee after she was sent home on July 30, 2013, and had timely disclosed him as a witness.[15] According to Plaintiff, two days after mediation, Lensey "disappeared" and would not respond to Plaintiff's efforts to contact him.[16] Plaintiff contends that, while she was attempting to locate Lensey, she learned that Elliott

---

[12] Fed. R. Civ. P. 26(e)(1)(A).

[13] Fed. R. Civ. P. 37(c)(1).

[14] (Ev. Obj. Sur-reply p. 2, (ECF No. 45.)

[15] (*Id.*)

[16] (*Id.*)

and Watson had similar knowledge. Plaintiff does not explain why Beckum was not timely disclosed as a witness.

Based on Plaintiff's explanation, the Court finds that her failure to timely disclose Elliott and Watson was substantially justified, and the Court will not strike their affidavits.[17] The Court also finds that the failure to timely disclose Beckum was not justified, and she will be **STRICKEN** as a witness[18]

Statement of Facts

The parties agree that the following facts are undisputed for the purpose of deciding this motion.[19]

Defendant Sharp hired Plaintiff on September 9, 1991, as a casual employee; Plaintiff became a regular employee in January 1992. As a regular employee, Plaintiff was a member of the union, the International Brotherhood of Electrical Workers, AFL-CIO, Local 474, which had a Collective Bargaining Agreement ("CBA") with Defendant.

When Plaintiff became a regular employee, she was a Grade F-2 Assembler in the Microwave Oven Department ("Microwave") working on a production line. Plaintiff held other positions in Microwave during her employment, but, between the time of her work injury of September 8, 2010, and her termination, she was an F-2 Assembler.

---

[17] Although Defendant references a confidentiality provision in the severance agreement that Elliott signed, (Tanaka Aff. Para. 3, ECF No. 39-4.), Defendant has not argued that Elliott's testimony is prohibited by this provision.

[18] *See Taylor v. Thomas*, 2013 WL 4048551 (W.D. Tenn. 2013), *aff'd* 624 F. App'x 322 (6th Cir. 2015) (court properly struck affidavits of witnesses who were not disclosed until response to motion for summary judgment filed after discovery closed and four months prior to trial).

[19] (Amd. Resp. Pl's Resp. to Def's SOF, ECF No. 36-12.)

On September 8, 2010, Plaintiff was working on the production line when a forklift hit the line, which caused it to move and hit Plaintiff's knee. Plaintiff reported her injury to Defendant's company nurse, Rosalyn McClain, who administered first aid. Plaintiff returned to work but continued to complain of pain in her knee, so Defendant sent Plaintiff to the medical facility, Concentra, who gave her a work restriction of 100% sitting.

Defendant placed Plaintiff on leave on the ground that it did not have any work that met those restrictions at that time although Plaintiff contends that she could have been returned to her original position on the K-B line building control panels because that was a sitting position. Defendant called Plaintiff on September 17, 2010, to report for work for a light duty position. On September 21, 2010, Defendant sent Plaintiff a letter informing her that her time off would be counted as FMLA leave.

Plaintiff was later treated by an orthopedic surgeon, Dr. W. Lee Moffat, who continued the work restrictions of 100% sitting. Plaintiff also saw Dr. Aren Manugian, who kept the work restrictions of 100% sitting.

Defendant assigned Plaintiff to a different light duty position until she was released to full duty by Dr. Manugian on February 8, 2011. Plaintiff then returned to her regular F-2 Assembler position in Microwave at full duty, where she remained until Dr. Moffat performed surgery on her knee on May 31, 2011. Defendant informed Plaintiff that her time off work beginning May 31, 2011, would be counted as FMLA leave.

Dr. Moffatt released Plaintiff to full duty on August 8, 2011, at which time she returned to her regular F-2 Assembler position in Microwave with no restrictions.

Plaintiff continued to see Dr. Moffatt as needed on October 26, 2011, January 11, 2012, and October 16, 2012, and he kept Plaintiff at full duty with no restrictions following those

visits. Plaintiff does not recall seeing Dr. Moffatt between October 16, 2012, and June 12, 2013. Plaintiff saw Dr. Moffatt on June 12, 2013, at which time he placed her on permanent restrictions of no prolonged standing or walking for more than two to three hours at a time, no pushing or pulling more than twenty pounds, no overhead lifting of more than fifteen pounds, and no lifting of over ten pounds.

On June 18, 2013, Plaintiff brought Nurse McClain a note asking that, as an accommodation, she be placed in a permanent position on K-B line and requesting that, when that line was down, to be placed in another position. In response to this note, Nurse McClain and Plaintiff's supervisor, Glenn Burnett, identified positions that they believed met her restrictions to try and accommodate Plaintiff.[20]

On July 30, 2013, Plaintiff was performing a job on F-line when she complained to Nurse McClain that the position was hurting her knee. Plaintiff showed Nurse McClain the task she was performing and how it was bothering her. Nurse McClain sent Plaintiff to lunch so she could discuss the matter with T.C. Jones, Karin Tanaka, and Reginald Yurchik in Defendant's Human Resources Department ("HR"). Nurse McClain described the situation to them and was instructed to ask Plaintiff was there anything she could think of to accommodate her in the F-line position. Nurse McClain asked Plaintiff what she could do to accommodate her in that position, and Plaintiff responded that she could not think of anything. Plaintiff asked to be put in another

---

[20]  Although Plaintiff states that this fact is disputed, Plaintiff acknowledges that "Nurse McClain testified in her deposition that she and Glen Burnett identified several positions that Ms. Jones could be placed in that would accommodate her disability." (Amd. Resp. Pl's Resp. to Def's SOF No. 23, ECF No. 36-12.) There does not appear to be any discernible difference in the wording of Defendant's "fact" and Plaintiff's response.

position but was not because Nurse McClain "assumed" that there were no available open positions.[21] Nurse McClain instructed Plaintiff to clock out and go home.[22]

On August 29, 2013, Plaintiff requested FMLA leave from August 14, 2013, to September 14, 2013, for depression. Defendant gave Plaintiff an Employer Response to Employee Request for FMLA Leave and Designation Notice that informed Plaintiff that her leave from August 14 to September 14, 2013, would be FMLA leave pending receipt of the medical certification. Plaintiff's psychologist, Dr. Russell Crouse, completed the certification and returned it to Defendant on September 10, 2013. Dr. Crouse stated on the certification that Plaintiff's condition commenced on August 1, 2013, and that she would be incapacitated from August 1 to October 31, 2013.

Plaintiff completed another Leave Request Form on September 19, 2013, asking for leave from September 19, 2013, to October 31, 2013. Defendant gave Plaintiff another Employer Response to Employee Request for FMLA Leave and Designation Notice that informed that Plaintiff her leave from September 14 until October 31 would be FMLA leave.

Plaintiff completed another Leave Request Form on October 24, 2013, asking for leave until January 13, 2014. Plaintiff submitted a letter from Dr. Crouse stating she could not return to work October 31, 2013, as he had hoped and Plaintiff needed an extension of her FMLA leave.

---

[21] Plaintiff contends that there were, in fact, open positions and that Nurse McClain did not check to see if there were any openings. (Amd. Resp. Pl's Resp. to Def's SOF, No. 29, ECF No. 36-12.)

[22] Defendant contends that Plaintiff was placed on leave provided by Article 16.5 of the CBA beginning July 31, 2013, as an accommodation, while Plaintiff contends that the leave was not CBA leave because she did not apply for it as required by Article 16.5. (*Id.* at No. 31.)

Defendant sent Plaintiff a letter on October 25, 2013, informing her that her FMLA leave had been extended to November 3, 2013, at which time her FMLA leave would be exhausted. This letter also informed her that, beginning November 4, her leave would be counted under Article 16.5 of the CBA, that all leave available to her would expire on December 15, 2013, and she should return to work December 16, 2013. Defendant gave Plaintiff another Employer Response to Employee Request for FMLA Leave and Designation Notice that informed Plaintiff that her FMLA and CBA leave would exhaust on December 15, 2013, and she should return to work on December 16, 2013.

Plaintiff did not return to work on December 16, 2013, and Defendant terminated her employment on December 23, 2013. Plaintiff attempted to get her job back through her union grievance policy, but Defendant refused to reinstate her.

Plaintiff does not know who made the decision to terminate her employment, does not know who recommended her termination, and does not know who was involved in the decision to terminate her employment. Plaintiff was not released to return to work until January 13, 2014.

Article 16.5 of Defendant's CBA allows covered employees a maximum leave of five months, i.e., twelve weeks of FMLA (eighty-four days) and eight weeks (fifty-six days) of CBA leave "except as otherwise required by law," for a total of 140 days.

An F-2 Assembler performs several different jobs on a production line in order to produce a finished microwave oven, although an F-2 Assembler does not perform all of the different jobs on the line at the same time. Instead, each Assembler is assigned a certain position on the line, and she performs that function. These jobs include door assembly, control panel ("CP") assembly, "pack out" where the employee adds a plastic cover to a microwave, inserts cardboard protection, and inserts a literate packet into the finished box, operating a mechanical

hoist to lift a microwave chassis onto the production line for assembly, and once assembled, using the hoist to put the microwave into a box for packing and shipping, building boxes for the finished microwave, loading and unloading carts for door assembly, and operating a foam machine to process scrap styrofoam. These functions occur on several different production lines within the department-F-line, G-line and KB-line.

According to the written job description, the F-2 Assembler position requires that an employee be able to lift over seventy-five pounds on a regular basis. In performing her F-2 position, Plaintiff had to lift over ten pounds. Some F-2 positions require standing more than two to three hours, which Plaintiff is permanently restricted from doing. This includes the KB-line where she would have to stand all day.

Some production lines may be busier than other lines due to greater production requirements, which would require a reallocation of employees to the busier lines. Not all lines run all the time, and some lines have to shut down from time to time. There could be times when lines would be shut down, and Plaintiff might be moved to a position that required standing.

Plaintiff is not aware of any employee who exhausted her available FMLA and CBA leave but was not terminated. Plaintiff requested and received FMLA leave several times throughout her employment with Defendant. Plaintiff returned to work each time she took this leave prior to her termination.

Defendant uses a rolling twelve-month period measured backward from the date an employee uses FMLA leave to determine how much FMLA leave an employee has remaining. Defendant informs employees of this through its Leave Request Forms and Employer Response to Employee Request for Family Medical Leave.

Defendant charged Plaintiff with eighty-four days of FMLA leave from August 14 to November 3, 2013, and June 3 and 4, 2013. Defendant charged Plaintiff with fifty-six days of CBA leave from July 31 to August 13, 2013, and November 4 to December 15, 2013,[23] although Plaintiff disputes that she was on CBA leave on July 31 to August 13, 2013, on the grounds that she did not request CBA leave and her absence from work was "forced" on her by Defendant. Plaintiff believes that her leave should not have started until August 14, 2013.

When asked in her deposition what facts Plaintiff had to support her contentions that she was retaliated against for filing an EEOC charge, she responded that she believed Defendant was trying to fire her. Plaintiff testified that she was terminated because she made a workers' compensation claim and believes "all this happened because I was injured on the job." She also testified that she was terminated because she had been employed with Defendant for twenty-three years, and Defendant was ready for her to leave.

Glen Burnett and Nurse McClain did not make any decision regarding Plaintiff's employment status. The decision to terminate Plaintiff's employment was made by T.C. Jones, Jr., then Vice-President of HR.

Plaintiff's Claims

Plaintiff alleges that she injured her knee at work on September 8, 2010, and, the injury resulted in a disability as defined by the ADA.[24] Plaintiff claims that Defendant discriminated against her under the ADA by denying her request for a reasonable accommodation.[25] Plaintiff also alleges that Defendant interfered with her rights under the FMLA by allegedly

---

[23] Defendant counted both week days and weekends in arriving at its totals.

[24] (Cmplt. ¶ 8, ECF No. 1.)

[25] (*Id.* ¶¶ 39-40.)

miscalculating her leave so that it appeared that she had exhausted all of her FMLA leave.[26]

Plaintiff finally claims that she was retaliated against after filing a charge of discrimination with the EEOC, requested a reasonable accommodation under the ADA, and took FMLA leave.[27]

ADA Discrimination Claim

Defendant contends that summary judgment is appropriate on Plaintiff's claim that Defendant discriminated against her by failing to provide her with a reasonable accommodation under the ADA. According to Defendant, Plaintiff was not a qualified individual with a disability within the meaning of the ADA because she was unable to perform the essential functions of her position at the time of her termination and an extension of her leave of absence would have posed an undue hardship on Defendant. Defendant argues that (1) even if Plaintiff received an extension of her leave, she was not qualified for her position with or without a reasonable accommodation due to her permanent physical restrictions and (2) Plaintiff's proposed accommodation of providing her with a permanent position on the production line and then finding her another position when the line shut down was not reasonable.

The ADA prohibits discrimination against "a qualified individual with a disability,"[28] and defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."[29] Claims premised on an employer's failure to offer a reasonable accommodation necessarily involve

---

[26] (*Id.* ¶¶ 43-44.)

[27] (*Id.* ¶¶ 46-49.)

[28] 42 U.S.C. § 12112(a).

[29] *Id.* § 12112(b)(5)(A).

direct evidence of discrimination, i.e., the failure to accommodate, rather than circumstantial evidence.[30]

> When an ADA plaintiff premises his claim upon direct evidence, we jettison the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases (also called "circumstantial-evidence cases"), and we analyze the claim under the following framework:
>
> > (1)The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.[31]

Thus, a plaintiff has the burden of establishing that she is otherwise qualified to perform the essential functions of her job, absent the challenged job criteria or with the proposed reasonable accommodation, and the employer then bears the burden of proving that a particular job requirement is essential as a business necessity or that a proposed accommodation imposes an undue hardship upon the employer.[32] When the employee seeks an accommodation and claims that she would be qualified to perform the essential functions of the job with such accommodation, the issues are whether such accommodation is reasonable, whether such accommodation would impose an undue hardship on the employer, and whether the plaintiff is capable of performing the job even with the suggested accommodation.[33] "The term essential

---

[30] *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

[31] *Id.* at 869 (citation omitted).

[32] *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1183 n. 8 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acq. Corp.*, 681 F.3d 312 (6th Cir. 2012).

[33] *Id.*

functions means the fundamental job duties of the employment position the individual with a disability holds or desires," but it does not include only marginal functions.[34] An employee who cannot perform the job's essential functions is not a qualified individual under the ADA.[35]

Defendant does not contest that Plaintiff is disabled for purpose of this motion for summary judgment only. Therefore, the question before the Court is whether there is a genuine issue of material fact as to whether Plaintiff was "otherwise qualified" for her position if her requested reasonable accommodation was granted.

Defendant first contends that Plaintiff's "uncertain" leave of absence made her not otherwise qualified. It is undisputed that Plaintiff could not return to work on December 23, 2013, the date of her termination. In support of its argument, Defendant relies on *Aston v. Tapco Int'l Corp.*[36] In *Aston*, the plaintiff/employee requested a leave of absence from May 22, 2010, until January 1, 2011, for a heart condition.[37] The employer provided the plaintiff with twelve weeks of FMLA leave, as well as short-term disability leave, but the employer's policy did not provide for holding positions open beyond twenty-six weeks of leave.[38] The employer terminated the plaintiff at the end of the twenty-six weeks when he was not able to return to work at that time.[39]

---

[34] 29 C.F.R. § 1630.2(n)(1).

[35] *Hoskins v. Oakland Cnty. Sherriff's Dep't*, 227 F.3d 719, 724 (6th Cir. 2000).

[36] 2015 WL 7434652 at *4 (6th Cir. 2015).

[37] *Id.* at *1.

[38] *Id.*

[39] *Id.* at *2.

The Court of Appeals held that the plaintiff's termination did not violate the ADA because, at the time of his termination, the plaintiff had not been released to return to work and, therefore, was not able to perform the essential functions of his position.[40]

> The question is not whether he was qualified to work after January 1, 2011. [T]he relevant time in determining whether a plaintiff is a "qualified individual" covered under the ADA is at the time of discharge. *Griffith v. Wal–Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998). Given Dr. Karabajakian's deposition testimony [regarding the plaintiff/employee's restrictions], it seems undisputed that, at the time of Aston's termination on November 22, 2010, Aston was not physically able to perform the essential functions of the job.[41]

The *Aston* Court also determined that an extension of the employee/plaintiff's leave would have posed an undue hardship on the employer.[42] The plaintiff had not provided a certain date of return to work, and the employer could reasonably question whether the plaintiff could return on that date provided. The Court noted that, when an employee's return date is not certain, an employer is not required to keep open a job for an employee indefinitely as a reasonable accommodation.[43]

Plaintiff contends that *Aston* is inapposite because the employer in *Aston* did not cause the employee's disability, i.e., the disability was not work-related; the employee did not request an accommodation; and the employer did not "force" the employee to take leave and then "use that forced absence to deplete Aston's remaining leave days to justify his termination."[44]

---

[40] *Id.* at *4 ("Therefore, had Aston returned to work, with or without accommodation, he would have been incapable of meaningfully completing any of the physical labor his job required of him.").

[41] *Id.*

[42] *Id.* at *5.

[43] *Id.* (citing *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000)).

[44] (Amd. Resp. Pl's Resp., pp. 20-21, ECF No. 36.)

Plaintiff also argues that her leave would not have been exhausted until January 14, 2014, the day after she was scheduled to return to work, if she had not been "forced" to use CBA leave from July 31 to August 31, 2013, and if Defendant had correctly calculated her leave.

Because the issue of whether Defendant correctly counted the time that Plaintiff was off work beginning July 31 to August 13, 2013, as CBA leave affects Plaintiff's various claims, the Court will decide this issue first. It is undisputed that, on July 30, 2013, Plaintiff reported that her knee was hurting, and she asked to be placed in a different position. Instead, she was sent home, and Nurse McClain was instructed by Defendant's HR to code her time off as leave under the CBA.

Plaintiff insists that leave cannot be counted as CBA leave unless the employee requests to be placed on CBA leave. The express language of the CBA supports Plaintiff's argument. Article 16.5 provides that a leave of absence "may be extended upon proper application." However, Defendant has submitted the affidavit of Karin Tanaka, Defendant's Human Resources Director, which states that "[i]t is not the practice of policy of Sharp to require an employee to formally request a leave of absence provided by Article 16 of the CBA in order to be granted such leave."[45]

When interpreting a CBA, the Court applies traditional rules of contract and looks first to the CBA's explicit language to determine the parties' intent.[46] If the plain language is susceptible to more than one interpretation, the Court considers extrinsic evidence to supplement the parties' intent.[47] In doing so, the parties' practice, usage, and custom can be considered.[48]

---

[45] (Tanaka Aff., No. 6, ECF No. 39-4.)

[46] *See Moore v. Menasha Corp.*, 690 F.3d 444, 451 (6th Cir. 2012).

[47] *Id.*

In the present case, the Court finds that the CBA is ambiguous as to whether an employee has to formally request leave under Article 16.5 to have that leave counted as CBA leave. Looking to the parties' "practice, usage, and custom," the Court also finds that, although there is evidence in the record that a formal request is not required, there is also evidence that leave was not counted as CBA leave until after the employee had exhausted her FMLA leave and, when this happened, a letter was sent to the employee informing her that she was now using CBA leave.[49]  It is undisputed that, even though on July 31, 2013, Plaintiff had not exhausted her FMLA leave, she was charged with CBA leave and was not informed by letter that she was on CBA leave.  Construing the evidence in the light most favorable to Plaintiff, the nonmovant, the Court finds that there is a disputed issue of fact as to whether Defendant could properly charge Plaintiff with CBA leave for this time period.

Even if Defendant could properly count the time period of July 31 to August 13, 2013, as CBA leave,[50] there is also a dispute as to whether Defendant could count the entire fourteen day period because Plaintiff has provided evidence that she worked Monday through Friday, five days a week, as opposed to seven days a week.[51]  If only week days are counted, Plaintiff would have been charged with only ten days as CBA leave.  The evidence showing that Defendant may have miscalculated Plaintiff's leave for this time period and for the time periods discussed below

---

[48]  *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989).

[49]  (McClain Dep. pp. 147-48, ECF No. 36-5.)

[50]  To the extent that Plaintiff argues that Defendant caused her to take leave, the FMLA is not concerned with how a health condition occurred, but, instead, with whether that health condition precludes the employee from performing the essential functions of her job at the end of the leave period.  *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

[51]  (Pl's Aff. Para. 11, ECF No. 46-2.)  The Court's determination that there is a dispute as to whether Defendant may count weekends as part of Plaintiff's leave is applicable to both her leave under the FMLA and CBA.

creates a disputed issue of fact as to whether Defendant discriminated against Plaintiff under the ADA by not allowing her to take time off to which she was entitled as an accommodation under the ADA.

Plaintiff submitted an October 24, 2013, letter from Dr. Crouse informing Defendant that he had originally hoped Plaintiff could return to work by October 31, 2013, but she was unable to return on that date. Dr. Crouse wrote that his goal was for Plaintiff to return by January 13, 2014, some ten weeks later. He originally "hoped" she could return by October 31 but had to shift his "goal" for her to return by January 13. Defendant contends that, because Dr. Crouse's letter failed to provide a date certain for Plaintiff to return to work, it was not required to keep Plaintiff's job open for her indefinitely as a reasonable accommodation

It is undisputed that Plaintiff actually was released on January 13, the date specified by Dr. Crouse. It is mere speculation by Defendant that Plaintiff's release date might have been extended beyond January 13. Even though an extension of her leave of absence without a certain return date might have posed an undue hardship on Defendant and not was required by the ADA, the Court cannot find as a matter of law that Dr. Crouse did not set a date certain for Plaintiff to return to work.

Defendant points to the fact that Plaintiff had not been released to return to work by her psychologist by December 23, 2013, which was the date of her termination. Defendant reasons that, therefore, Plaintiff was not physically able to perform the essential functions of her position as of that date, and she was not a qualified individual under the ADA.[52] Because there is a dispute as to whether Defendant correctly calculated Plaintiff's leave, Defendant is not entitled to summary judgment on this issue.

---

[52] *See Aston*, 2015 WL 7434652 at *4-5.

Defendant also argues that providing Plaintiff with an extension of her leave to January 13, 2014, would have been an undue hardship. Article 16.5 of the CBA provides employees with a maximum of five months leave. Defendant argues that, by December 16, 2013, Plaintiff had exhausted all leave available to her and, if Defendant were to grant her any additional leave, it would have violated the CBA. While Defendant is correct that an employer does not have to violate a collective bargaining agreement in order to provide a reasonable accommodation,[53] again, the Court notes that there is a dispute as to the calculation of Plaintiff's leave and, therefore, the Court cannot find as a matter of law that Plaintiff was not "otherwise qualified" for her job on this ground or that extending Plaintiff's leave (leave to which she may have already been entitled) would have created an undue hardship on Defendant.

There is also a dispute as to whether Defendant's unilateral decision to "accommodate" Plaintiff's disability by sending her home on July 30 and counting her absence from July 31 to August 13 as CBA leave was a reasonable accommodation under the ADA in light of evidence that Defendant may have had positions that Plaintiff could have filled despite her disability. Plaintiff has pointed to evidence that Nurse McClain and Glenn Burnett, Plaintiff' supervisor, identified positions she could perform with her restrictions and Defendant could have accommodated her by placing her in the positions it identified.

The EEOC regulations interpreting the ADA "place the initial burden of requesting an accommodation on the employee."[54] Once that request is made, "the employer has a duty to

---

[53] *See Burns v. Coca-Cola Enters. Inc.*, 222 F.3d 247, 257 (6th Cir. 2000) ("Employers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual.").

[54] *Gant v. Wilson Sporting Goods Co.*, 143 F. 3d 1042, 1046 (6th Cir. 1998).

engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'"[55] The question of whether an accommodation is reasonable is a question of fact.[56]

It is undisputed that, on June 18, 2013, Plaintiff brought Nurse McClain a note asking that, as an accommodation, she be placed in a permanent position on K-B line and requesting that, when that line was down, to be placed in another position and that, in response to this note, Nurse McClain and Burnett identified positions that they believed met her restrictions.[57] Thus, Plaintiff met her burden of requesting an accommodation, which led to Nurse McClain and Burnett engaging in the interactive process with her.

It is also undisputed that, on July 30, 2013, Plaintiff's accommodated G-line position became inoperable due to the unavailability of machine parts. As a result, Plaintiff was assigned to a position in a particular area on the F-line that required her to lift more than ten pounds.[58] Plaintiff asked to be put in another position but was not because Nurse McClain "assumed" that there were no available open positions and told Plaintiff to clock out and go home.

Plaintiff contends that there were, in fact, open positions and that Nurse McClain did not check to see if there were any openings.[59] In her affidavit, Plaintiff avers that Nurse McClain

---

[55] *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84-85 (6th Cir. 2012) (quotation omitted.)

[56] *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998); *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992).

[57] (Amd. Resp. Pl's Resp. to Def's SOF No. 23, ECF No. 36-12.) According to Plaintiff, Nurse McClain and Burnett specifically identified the G-Line, the control room panel, and the foam room as positions that Plaintiff could work that would accommodate her disability. (Pl's Aff. p. 5, ECF No. 36-13.)

[58] (Pl's Aff. p. 7, ECF No. 36-13.)

[59] (Amd. Resp. Pl's Resp. to Def's SOF No. 29, ECF No. 36-12.)

told her that she would call her when the G-line was in operation.[60]  Plaintiff points to evidence that the G-line restarted on July 31, 2013, and Defendant did not return her to work.  Instead, a casual worker was inserted into her position on G-line.[61]  This evidence creates an issue of disputed fact as to whether Defendant provided Plaintiff with a reasonable accommodation when it did not return her to work on the G-line and, instead, counted her absence as CBA leave.

Next, Defendant argues that Plaintiff was not "otherwise qualified" for her job because of her physical restrictions.  Plaintiff was a Grade F-2 Assembler in the Microwave Oven Department.  An F-2 Assembler performs several different jobs on a production line in order to produce a finished microwave oven.[62]  Defendant contends that an essential function of the F-2 Assembler position is the ability to perform all F-2 jobs within that position which includes being able to lift over seventy-five pounds on a regular basis.  It is undisputed that Plaintiff's permanent physical restrictions limited her to only lifting ten pounds.  Additionally, some F-2 positions require standing more than two to three hours, which Plaintiff is permanently restricted from doing.  Defendant argues that Plaintiff's permanently occupying only one F-2 Assembler position would eliminate an essential function of the position – that she be able to perform all F-2 positions and, accordingly, the proposed accommodation is unreasonable as a matter of law.[63]

To provide a reasonable accommodation, an employer may be required to modify the responsibilities of a disabled employee's existing job or transfer the employee to a vacant

---

[60]  (Pl's Aff. p. 7, ECF No. 36-13.)

[61]  (Webster Aff. p. 2, ECF No. 36-3.)

[62]  (Amd. Resp. Pl's Resp. to Def's SOF, ECF No. 36-12.)

[63]  *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 757 (6th Cir. 2015) (Reasonable accommodation does not include removing an essential function because that is per se unreasonable.).

position with different responsibilities.[64]  If an employee seeks to stay in her current job, the "reasonable accommodation" is defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position [to stay in the position]."[65]  As noted by Defendant, a suggested accommodation is not reasonable if it requires eliminating an essential function of the job.[66]

Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment."[67]  Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires.  The term ... does not include the marginal functions of the position."[68]  A job function may be considered essential because the position exists to perform the function, a limited number of employees are available that can perform it, or it is highly specialized.[69]  "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors."[70]  The "employer's judgment as to what functions of a job are essential" and an employer's "written description" of

---

[64]  29 C.F.R. § 1630.2(o); *Kleiber*, 485 F.3d at 870.

[65]  29 C.F.R. § 1630.2(o).

[66]  *Id.*

[67]  *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013).

[68]  29 C.F.R. § 1630.2(n)(1).

[69]  *Id.*

[70]  *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (citation omitted); *see also Keith*, 703 F.3d at 925–26.

the job are only two factors to be considered.[71]  Additionally, the Court may consider:  (1) the amount of time spent on the job performing the function; (2) the consequences of not requiring the incumbent to perform the function; (3) the terms of a collective bargaining agreement; (4) the work experience of past incumbents in the job; and (5) the current work experience of incumbents in similar jobs.[72]

At the summary judgment stage, the employer's judgment is not dispositive on whether a function is essential in the presence of contradictory evidence.[73]  If an employer's judgment about what qualifies as an essential task were conclusive, "an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is essential, avoid the clear congressional mandate that employers mak[e] reasonable accommodations."[74]

Written job descriptions are also not dispositive, and testimony that a job function is marginal may refute a written description that states that a job function is essential.[75]  Although the employer's judgment and the written job descriptions warrant some deference, the plaintiff employee may put forth evidence that contradicts the employer's assertions, thus defeating summary judgment.[76]

---

[71]  42 U.S.C. § 12111(8).

[72]  29 C.F.R. § 1630.2(n)(3)(iii)-(vii).  *See also Henschel v. Clare County Road Comm.*, 737 F.3d 1017 (6th Cir. 2013) (applying five factor test for assessing whether a function is essential).

[73]  *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012); *Keith*, 703 F.3d at 926.

[74]  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)) (internal quotation marks omitted)).

[75]  *Id.* at 1257.

[76]  *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 283 (3d Cir. 2001).

If a plaintiff's requested accommodation is a transfer to a different position, an employer has a duty to locate a suitable position, although "to overcome summary judgment, the plaintiff generally must identify the specific job [she] seeks and demonstrate that [she] is qualified for that position."[77] "[A]n employer need only reassign the employee to a vacant position."[78]

In the present case, Plaintiff has pointed to evidence that, during her employment with Defendant, she was never required to lift seventy-five pounds.[79] A position not requiring lifting seventy-five pounds was in the control panel room, as well as the kit line, the molding position, and the G-line.[80] Plaintiff avers that her primary position with Defendant "was to build control panels which is an F-2 position and within [her] medical restrictions, without any alterations to the job and it never shuts down."[81] This position was a 100% sitting position.[82]

Defendant argues that lines may shut down due to lack of parts or because production needs have been met for the day, thus requiring employees to be able to move to other positions

---

[77] *Kleiber*, 485 F.3d at 870.

[78] *Cassidy*, 138 F.3d at 634.

[79] (Pl's Aff. p. 1-2, ECF No. 36-13.) Julia Elliott's affidavit also states that, during her fifteen year employment with Defendant, she was never required to lift seventy-five pounds, nor did she witness any other employee lifting seventy-five pounds. (Elliott Aff. p. 1, ECF No. 36-2.)

[80] (*Id.* at p. 2.) In its reply, Defendant argues that, even if lifting seventy-five pounds was not an essential function of Plaintiff's job, she would have at least had to be able to lift ten pounds, and Plaintiff was permanently restricted from lifting ten pounds. (Reply at p. 5, ECF No. 39.) There is not enough evidence in the record at this juncture for the Court to determine if the positions identified as possible accommodations for Plaintiff required lifting more than ten pounds. Because Nurse McClain and Burnett identified those positions as ones that Plaintiff could do with her restrictions, the implication is that Plaintiff would not have been required to lift more than ten pounds.

[81] (*Id.*)

[82] (*Id.* p. 3.)

on other production lines. However, there is evidence, as noted above, that the control panel room, one of the positions identified by Nurse McClain and Burnett as suitable for accommodating Plaintiff's restrictions, never shut down.[83]

Finally, Defendant argues that Plaintiff has not presented evidence that positions that would accommodate her permanent restrictions were open and vacant. While Defendant is correct that a plaintiff must identify a vacant, funded position for which she was qualified, with or without accommodation, that existed at the time of her request for reassignment,[84] as discussed above, there is evidence that there was an open position on the G-line that was filled by a casual worker after Plaintiff was sent home on July 30, 2013.

During the interactive process required by the ADA, Nurse McClain and Burnett identified jobs that Plaintiff could do with her permanent restrictions. The ADA requires both the employee and employer to interact in good faith to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."[85] Employers who fail to engage in this interactive process in good faith face liability under the ADA if reasonable accommodations would have been possible.[86] If Defendant now contends that it had no positions that Plaintiff could perform with her permanent restrictions

---

[83] (*Id.*) At her deposition, Nurse McClain testified that jobs identified as ones that Plaintiff could perform with her permanent restrictions were working on the foam machine, working in the control panel room, and working the F-Line and the G-Line. (McClain Dep. at pp. 89-90, ECF No. 36-5.)

[84] *See Willard v. Potter*, 264 F. App'x. 485, 487–88 (6th Cir. 2008).

[85] *Lafata v. Church of Christ Home for the Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) (quoting 29 C.F.R. § 1630.2(o )(3)); *see also Kleiber*, 485 F.3d at 871 ("Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith.").

[86] *Lafata*, 325 F. App'x at 422.

despite the representations of Nurse McClain and Burnett to Plaintiff, then the trier of fact could find that Defendant did not engage in the interactive process in good faith.

Because there are disputed issues of material fact as to whether Defendant discriminated against Plaintiff under the ADA by failing to reasonably accommodate her disability, Defendant's motion for summary judgment on this claim is denied.

FMLA Claims

The FMLA allows qualifying employees to take up to twelve weeks of unpaid leave so that they may recover from serious medical problems or so that they can attend to family members who may suffer from such problems.[87] "If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."[88] To thwart attempts by employers to discriminate against employees for taking such leave by retaliating against them, Congress made such actions a violation of the FMLA as follows:

> Interference with rights
>
> (1) Exercise of rights
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>
> (2) Discrimination
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.[89]

---

[87] *See Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing 29 U.S.C. § 2615).

[88] *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 447 (6th Cir. 2007).

[89] 29 U.S.C. § 2615(a).

Thus, the FMLA creates two types of claims: interference claims,[90] in which an employee asserts that her employer denied or otherwise interfered with her rights under the FMLA, and retaliation claims, in which an employee asserts that her employer discriminated against her because she engaged in activity protected by the FMLA. In the present case, Plaintiff has brought both interference and retaliation claims.

"The issue [under the interference theory] is simply whether the employer provided its employee the entitlements set forth in the FMLA - for example, a twelve week leave or reinstatement after taking a medical leave."[91] To prevail on an interference claim, an employee must prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.[92]

At this juncture, Defendant does not dispute that Plaintiff has shown the first four elements. Instead, Defendant contends that Plaintiff has failed to show the fifth element, i.e., that it denied Plaintiff FMLA benefits to which she was entitled. Defendant argues that summary judgment is appropriate on Plaintiff's FMLA interference claim because Plaintiff exhausted all twelve weeks of her FMLA leave entitlement within the applicable twelve-month period and could not return to work. Defendant's argument is not persuasive.

---

[90] The "interference" or "entitlement" theory is derived from the FMLA's creation of substantive rights. *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

[91] *Id.*; *cf. Culpepper v. BlueCross BlueShield of Tenn., Inc.*, 321 F. App'x. 491, 496 (6th Cir. 2009) ("[The plaintiff's] FMLA [interference] claim ... must fail. Culpepper received exactly what her doctor ordered—six days of FMLA leave. No additional leave was authorized by the Certification, and Culpepper has not shown that the five [unexcused] absences at issue were taken for one of the reasons enumerated in the FMLA.").

[92] *See Walton*, 424 F.3d at 485.

As discussed above, there is a question of fact as to whether Defendant may count weekends as part of Plaintiff's leave or whether it is limited to counting week days only.[93] Defendant argues that "simple math" shows that June 3 to June 4 and August 14 to November 3 is a total of eighty-four days. On the other hand, "simple math" also shows that not counting weekends produces a total of sixty days of FMLA leave – a difference of twenty-four days. If Plaintiff used only sixty days of FMLA leave along with her CBA leave, she would not have exhausted her leave by December 13.[94]

Additionally, there is a dispute as to whether Defendant could charge Plaintiff with leave during the period that it closed its factory for the holidays beginning December 23, 2013, through January 5, 2014. Defendant argues that, even if Plaintiff had not exhausted her leave by December 15, she would have exhausted it during the holiday shut-down, and, thus, would have been terminated prior to January 14, the date that she was released to return to work. In support of its argument, Defendant has submitted the affidavit of Karin Tanaka which states that it is Defendant's practice, when closed for an extended period of time and an employee is already off work on CBA leave, to count that time off as CBA leave.[95]

---

[93] *See supra* note 52. *See also Mendel v. City of Gibraltar*, 607 F. App'x 461, 466-67 (6th Cir. 2015) (citing *Truitt v. Doyon Drilling, Inc*., 764 F. Supp.2d 1167, 1168-70 (D. Alaska 2010) (holding that an employee's FMLA leave may not be reduced by periods the employee is not scheduled to work); *see also* 60 Fed. Reg. 2180, 2203 (Jan. 6, 1995) ("An employee's FMLA leave entitlement may only be reduced for time which the employee would otherwise be required to report for duty, but for the taking of the leave. If the employee is not scheduled to report for work, the time period involved may not be counted as FMLA leave.").

[94] Defendant appears to argue that the Court should consider Plaintiff's FMLA claim without reference to her CBA leave. (Reply p. 4, ECF No. 39.) Because Defendant terminated Plaintiff for allegedly exhausting her combined leave, the two leave periods are intertwined. Even without reference to her CBA leave, there is still a dispute as to whether Defendant correctly calculated Plaintiff's FMLA leave.

[95] (Tanaka Aff. p. 2, ECF No. 39-4.)

In response to Defendant's argument, Plaintiff has submitted her own pay records which purport to show that holiday pay and vacation pay were used to cover Defendant's holiday shutdown and not unpaid leave.[96] Based on this evidence, the trier of fact could find that Defendant interfered with Plaintiff's FMLA leave by charging her with leave that had already been accounted for, thus defeating summary judgment.

Finally, Defendant argues that Plaintiff could not have worked as of August 1, 2013, because her psychologist, Dr. Russell Crouse, returned the FMLA certification on September 10, 2013, certifying that Plaintiff was incapacitated from an approximate date of August 1 to October 31, 2013.[97] As pointed out by Plaintiff, she did not see Dr. Crouse until August 14, 2013, and Defendant did not receive Dr. Crouse's certification until September; therefore Defendant could not have relied on this certification when failing to call Plaintiff back to work on July 31, 2016.[98]

Dr. Crouse based his August 1 diagnosis of depression, in part, on Plaintiff's statements concerning not being called back into work and her feelings about her loss of income.[99] Dr. Crouse opined in a follow-up letter sent on October 24, 2013, that "at least three major work-related obstacles were complicating [Plaintiff's] emotional recovery."[100] One of those obstacles was Plaintiff's fear of not being allowed to return to work.[101] The trier of fact could find that, if

---

[96] (Pl's Sur-reply, Payroll and Time Records, Sept. 2010 – Dec. 2013, ECF Nos. 51-1, 51-2; Pl's Aff. p. 3, 51-6.)

[97] (Pl's Dep. Exh. 16 p. 17, ECF No. 33-4.)

[98] (Crouse Aff. p. 1, ECF No. 36-1.)

[99] (*Id.* p. 2, ECF No. 36-1.)

[100] (*Id.*)

[101] (*Id.*)

Plaintiff had returned to work on July 31, she would not have become incapacitated on August 1.

There are disputed issues of fact as to whether Defendant denied Plaintiff the FMLA benefits to which she was entitled, and summary judgment on Plaintiff's FMLA interference claim is denied.

As for Plaintiff's FMLA retaliation claim, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."[102]  Retaliation claims impose liability on employers who act against employees specifically because those employees invoked their FMLA rights.[103]  However, the FMLA does not prohibit an employer from terminating a person who has exercised rights under the FMLA, provided that the reasons for termination are unrelated to the exercise of such rights.[104]  The issue raised by a retaliation claim is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason."[105]

The plaintiff may present direct or indirect evidence of intentional discrimination.[106]  In the absence of direct evidence of the employer's intent to retaliate, the plaintiff may rely on the

---

[102]  29 U.S.C. § 2615(a)(2).

[103]  *See Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005) (observing that the retaliation theory applies when a company seeks to punish an employee "for exercising rights or opposing an unlawful procedure").  *See also Nolen v. FedEx TechConnect, Inc.*, 971 F. Supp. 2d 694, 702 (W.D. Tenn. 2013) (*aff'd* May 28, 2014) ("Under the [FMLA] retaliation theory, the relevant inquiry is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.").

[104]  *See Joostberns v. United Parcel Services, Inc.*, 166 F. App'x 783 *5 - 6 (6th Cir. 2006).

[105]  *Edgar*, 443 F.3d at 508.

[106]  *Id.*

*McDonnell Douglas* burden-shifting framework.[107]  To establish a prima facie case of FMLA retaliation, a plaintiff must demonstrate that: (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there exists a causal connection between her exercise of a right under the FMLA and the adverse employment decision.[108]  If the employee satisfies these three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for discharging the employee and then back to the employee to show that the proffered reason was pretextual and the real reason was discrimination.[109]

In the present case, it is undisputed that Plaintiff took leave under the FMLA, which was a protected right, she was adversely affected when she was terminated from her position, and the taking of FMLA leave led to her termination.  Although Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, i.e., she had exhausted all her leave, as discussed above, there is a dispute as to whether Defendant correctly calculated Plaintiff's leave. If the trier of fact finds that Defendant miscalculated Plaintiff's leave, then it could also find that Defendant's stated reason for Plaintiff's termination had no basis in fact and was, thus, pretextual.[110]

---

[107]  *Id.*

[108]  *See Gibson v. City of Louisville*, 336 F.3d.511, 513 (6th Cir. 2003).

[109]  *Edgar,* 443 F.3d at 508.

[110]  *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)) (A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.).

Defendant argues that the fact that Plaintiff requested and received FMLA leave several times throughout her employment with Defendant and returned to work each time she took leave is evidence that Plaintiff was not retaliated against the final time she took leave. To the contrary, the trier of fact could find that the multiple leaves requested and taken by Plaintiff, including FMLA, CBA, and worker's compensation leave, unlawfully motivated Defendant to terminate her. Accordingly, summary judgment is denied on Plaintiff's FMLA retaliation claim.

ADA Retaliation Claim

To establish a prima facie case of ADA retaliation,[111] the plaintiff must show that: (1) she was engaged in a protected activity, (2) the exercise of her civil rights was known to the defendant, (3) the defendant subsequently took adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action - in this case the plaintiff's termination.[112] Once the plaintiff has established a prima facie case, the defendant has the burden to "prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."[113] If the defendant does so, then the plaintiff must "show that the proffered reason was not its true reason but merely a pretext for retaliation" by demonstrating that the defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action.[114]

---

[111] *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (When a plaintiff relies on circumstantial evidence of retaliation, the burden-shifting evidentiary framework of *McDonnell Douglas* applies.).

[112] *See Walborn v. Erie Cnty. Care Facility*, 150 F.3d 584, 588–89 (6th Cir. 1998).

[113] *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000).

[114] *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010) (citing *Manzer*)).

Defendant contends that the only protected activity on which Plaintiff may rely is her filing of a charge with the EEOC on June 11, 2013.[115]  In addition to the filing of an EEOC charge, "the showing of a good-faith request for reasonable accommodations" is a "protected act" for purposes of an ADA retaliation claim,[116] and Plaintiff may rely on the "good-faith request" she made to support her prima facie case.  Even though Nurse McClain and Burnett may not have known of the EEOC charge, they both knew that Plaintiff had requested a reasonable accommodation for her disability.

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."[117]  "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."[118]

Defendant argues that Plaintiff cannot rely on the proximity in time between the filing of her EEOC charge and her termination as evidence of causation because she filed her charge on June 11, 2013, and was not terminated until December 23, 2013, which was over six months later.  Even though the charge was made on June 11, 2013, the EEOC process was not complete until September 30, 2013.[119]  Plaintiff's request for a reasonable accommodation of being assigned to a position within her permanent restrictions was allegedly denied on July 30, 2013,

---

[115]  (Cmplt. ¶¶ 45-46, 49, ECF No. 1.)

[116]  *Baker v. Windsor Republic Doors*, 414 Fed.App'x 764, 776–77 & n. 8 (6th Cir. 2011).

[117]  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

[118]  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).

[119]  (Cmplt. ¶ 5, ECF No. 1.)

and continued until the date of her ultimate termination. Additionally, the alleged miscalculation of Plaintiff's leave occurred throughout this time period. Instead of looking at the discrete dates of June 11 and December 23, the trier of fact could find evidence of temporal proximity from the recurring events of the alleged denial of Plaintiff's request for a reasonable accommodation and the alleged miscalculation of her leave.

The trier of fact could also find as evidence of causation the fact of those same recurring events, i.e., the alleged denial of Plaintiff's request for a reasonable accommodation and the alleged miscalculation of her leave. Those events, if proved at trial, coupled with temporal proximity are sufficient to establish a causal connection between Plaintiff's protected activity and her termination.

Defendant argues that, even if Plaintiff has presented a prima facie case, it had a legitimate, non-discriminatory reason for her termination – the exhaustion of her combined leave. As previously discussed, there is a dispute as to whether Defendant correctly calculated Plaintiff's leave. If the trier of fact finds that Defendant miscalculated Plaintiff's leave, then it could also find that Defendant's stated reason for Plaintiff's termination had no basis in fact and was pretextual and that Defendant's real reason was unlawful retaliation.

Additionally, the trier of fact could find that Defendant's failure to follow its own practice in charging Plaintiff with CBA leave prior to the expiration of her FMLA leave and in not notifying her by letter that she was being charged with CBA leave is evidence of discrimination and/or retaliation. As a general rule, an employer's failure to follow its own policies is insufficient by itself to establish pretext, but such a failure may have some probative

value when considered in combination with other evidence.[120]  For these reasons, summary judgment is not appropriate on this claim.

Conclusion

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there are disputed issues of material fact that preclude summary judgment on all of Plaintiff's claims. Consequently, Defendant's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  May 3, 2016.

---

[120]  *See Marshall v. Belmont Cty. Bd. of Comm'rs*, 110 F. Supp. 3d 780, 791 (S.D. Ohio 2015), *aff'd*, 2016 WL 930117 (6th Cir. Mar. 10, 2016).